**In re METROMEDIA FIBER NETWORK, INC., et al., Debtors.**

**Metromedia Fiber Network, Inc., et al., Plaintiffs,**

**v.**

**Various State and Local Taxing Authorities, Defendants.**

**Bankruptcy Nos. 02–22736 (ASH) to 02–22742(ASH), 02–22744(ASH) to 02–22746(ASH), 02–22749(ASH), 02–22751(ASH) to 02–22754(ASH).**
**Adversary Nos. 02–05347 (ASH) to 02–05356(ASH), 02–05359(ASH), 02–05360(ASH).**

United States Bankruptcy Court, S.D. New York.

July 15, 2003.

Kronish, Lieb, Weiner & Hellman LLP, by Lawrence C. Gottlieb, Esq., Ronald R. Sussman, Esq., Richard S. Kanowitz, Esq., New York City, for Debtors/Plaintiffs.

Barr & Haas, LLP, by Harvey S. Barr, Esq., Spring Valley, NY, for Defendants Dallas Central Appraisal District, Foy Mitchell, Jr., Harris County Appraisal District and Jim Robinson.

Shannon, Gracey, Ratliff & Miller LLP, by Michael M. Tabor, Esq., Dallas, TX, for Defendants Dallas Central Appraisal District and Foy Mitchell, Jr.

Linebarger, Goggan, Blair & Sampson LLP, by Elizabeth Weller, Esq., Dallas, TX, for Defendants Dallas County, Margaret Keliher, City of Dallas, Shirley A. Acy, Dallas Independent School District, Dr. Mike Moses, City of Houston, Anna Russell, Cypress–Fairbanks Independent School District, Richard E. Berry, Houston Independent School District and Kay Stripling.

Office of County Counsel, by Marcy L. Berkman, Esq., San Jose, CA, for Defendants County of Santa Clara and Lawrence E. Stone.

Anderson, Kill & Olick, by Michael J. Venditto, Esq., New York City, for Defendants County of San Francisco and Doris M. Ward.

Office of County Counsel, by Joyce Aiello, Esq., Los Angeles, CA, for Defendants County of Los Angeles and Rick Auerbach.

Office of County Counsel, by Mary E. Baker, Esq., Houston, TX, for Defendants Harris County and Robert Eckels.

New York State Attorney General's Office, by Lewis Polishook, Esq., New York City, for Defendants New York State Office of Real Property Services, New York State Board of Real Property Services and Thomas G. Griffen.

Corporation Counsel of City of New York, by Gabriela Cacuci, Esq., New York City, for Defendants New York City Department of Finance and Martha E. Stark.

Department of Assessment and Taxation, by Jeffrey G. Comen, Esq., Baltimore, MD, for Defendants Maryland Department of Assessments and Taxation and Ronald W. Wineholt.

Sidley, Austin, Brown & Wood LLP, by Melissa Zelen Neier, Esq., New York City, for Defendants Virginia State Corporation Commission, Clinton Miller, County of Fairfax and Kevin C. Greenlief.

## DECISION ON MOTIONS TO DISMISS BASED ON SOVEREIGN IMMUNITY AND ABSTENTION

ADLAI S. HARDIN, JR., Bankruptcy Judge.

Presently pending in this Court are twelve adversary proceedings commenced by the debtors in these administratively consolidated Chapter 11 cases under 11 U.S.C. § 505 against "(1) state taxing entities charged with valuing and/or appraising personal property for the determination of ad valorem taxes; (2) local taxing entities charged with assessing and/or collecting ad valorem taxes; or (3) individual officers who represent these taxing entities and who are charged with insuring that the taxing entities comply with state law" (Debtors' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss Adversary Complaints, hereinafter the "Omnibus Memorandum," at 6).[1]

The debtors are in the business of providing fiber optic infrastructure, high-bandwidth Internet connectivity and man-

1. Debtors originally filed sixteen such adversary proceedings; four have been settled.

aged Internet infrastructure for customers in the United States and Europe. The debtors have constructed, maintained and operated a fiber optic network and related facilities throughout the United States and within all of the defendants' jurisdictions. Over 1,000 taxing jurisdictions within the United States assert that this infrastructure constitutes property taxable to the debtors ("Taxable Property"). Portions of the Taxable Property are located in each of the defendants' taxing jurisdictions and are subject to ad valorem taxation. The debtors assert that the final property tax must be based on the Taxable Property's fair market value.

The gravamen of the debtors' complaints in these adversary proceedings is that the defendants have appraised the debtors' Taxable Property, subsequently assessed, and are now seeking to collect ad valorem taxes from the debtors which are based on valuations grossly in excess of the Taxable Property's fair market value. The debtors ask this Court to determine the fair market value of the Taxable Property in each of the defendants' taxing jurisdictions under Section 505 of the Bankruptcy Code.

A number of defendants in the adversary proceedings have moved to dismiss the complaints on various grounds, the principal being the Eleventh Amendment of the United States Constitution and the doctrine of sovereign immunity, and abstention under 28 U.S.C. § 1334(c). For the reasons set forth below, all of the adversary proceedings will be dismissed.

### Jurisdiction

The threshold question which must be addressed before any other issue is the jurisdiction of this Court. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (" 'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and

when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.' *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869). 'On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.' *Great Southern Fire Proof Hotel Co. v. Jones, supra*, [177 U.S. 449] at 453[, 20 S.Ct. 690, 44 L.Ed. 842 (1900)]. The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.' *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382[, 4 S.Ct. 510, 28 L.Ed. 462] (1884)"); *Concourse Rehabilitation & Nursing Ctr. Inc. v. DeBuono*, 179 F.3d 38, 43 (2d Cir.1999) ("The threshold issue in this, and every case, is whether a federal court has subject matter jurisdiction over the suit before it"); *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed.Cir.2002) ("Jurisdiction is a threshold issue, *Johannsen v. Pay Less Drug Stores N.W., Inc.*, 918 F.2d 160, 161, 16 USPQ2d 1697 (Fed.Cir.1990), and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits, *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963, 42 USPQ2d 1956 (Fed.Cir. 1997)"); *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir.1999) ("A threshold issue in this case, as in every case, is subject matter jurisdiction"); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997) ("The threshold question in every federal case is whether the court has the judicial power to entertain the suit. *Warth v. Seldin*, 422 U.S.

490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)"); *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1325 (6th Cir.1993) ("This court's threshold duty in every case is to determine whether it has subject matter jurisdiction over the controversy before it").

The debtors seek relief under Section 505 of the Bankruptcy Code. Section 505(a)(1) provides as follows:

> (a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

Jurisdiction is invoked under 28 U.S.C. § 1334. Subsections (a) and (b) of Section 1334 provide as follows:

> (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
>
> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The jurisdiction so conferred on the district courts may be referred to bankruptcy courts under 28 U.S.C. § 157(a). In this District, jurisdiction over bankruptcy cases and proceedings has been referred to the bankruptcy courts within the District pursuant to the standing order of reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.

Accordingly, this Court has jurisdiction over these adversary proceedings unless jurisdiction is precluded by the Eleventh Amendment or the doctrine of sovereign immunity. Because the law on sovereign immunity has not been uniformly intuited by the many able jurists and scholars who have written on the subject over the last two centuries, a brief historical summary will be helpful before turning to the debtors' arguments.

## I. *Background: the Eleventh Amendment and sovereign immunity*

Sovereign immunity is said to derive from English common law of the Middle Ages as "settled doctrine that the King could not be sued *eo nomine* in his own courts." Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge as Statutory Ex parte Young Relief,* 76 Am. Bankr.L.J. 461, 473 (2002) (citing Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv. L.Rev. 1, 2 (1963)) (hereafter cited as "Brubaker I"). Various rationales have been articulated for this ancient doctrine, including the belief that the monarch served by divine right and therefore could be judged only by higher authority, variations of the expression "the king can do no wrong" (perhaps connoting that the king must not do wrong), the notion that the sovereign as the font of law with power to change it cannot be bound by the law, and the "indignity" of subjecting the king (or a lord) to suit at the instance of a common citizen in a society where noble birth mandated preferential treatment.[2] Brubaker I at

---

**2.** The purported "indignity" of subjecting a state to suit by a citizen has been described by the Supreme Court as the "very object and purpose of the [Eleventh] Amendment" in *In re Ayers,* 123 U.S. 443, 505, 8 S.Ct. 164, 31 L.Ed. 216, but also an "embarrassingly insuf-

484 (quoting 1 Blackstone, *Commentaries on the Laws of England,* 235, 238–39 (1765)). *See also* 3 W.S. Holdsworth, *A History of English Law,* 464–66 (3rd ed.1927). One would suppose that such shibboleths as these would not have impressed the founders as they gathered for the Constitutional Convention in 1787, having risked life and fortune in the War of Independence against the King of England, whose oppressive rule was unchecked by judicial rein.

But if princely prerogatives were held in disdain in revolutionary America, sovereign power, mistrust of central authority and economics were the great national issues in September 1787 when the delegates agreed upon the text of the new Constitution, and during the state ratification debates and in The Federalist Papers published in the months following. The founders had "split the atom of sovereignty"[3] between federal and state governments and in so doing devised a radically new form of governance, constrained by checks and balances. Every aspect of sovereignty was debated and held political consequence.

Moreover, state governments were genuinely concerned with their own fiscal issues and in particular state indebtedness incurred in connection with the War of Independence. In the excerpt from the Federalist Papers, which is universally quoted in legal and scholarly discourse on sovereign immunity, anti-Federalist anxiety respecting states' amenability to suit on such liabilities was addressed by Alexander Hamilton in Federalist No. 81 in May 1788:

> Though it may rather be a digression from the immediate subject of this paper, I shall take occasion to mention here, a supposition which has excited some alarm upon very mistaken grounds: It has been suggested that an assignment of the public securities of one state to the citizens of another, would enable them to prosecute that state in the federal courts for the amount of those securities. A suggestion which the following considerations prove to be without foundation.

> It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the union. Unless therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here. A recurrence to the principles there established will satisfy us, that there is no colour to pretend that the state governments, would by the adoption of that

ficient" rationale in the American context for either sovereign immunity or the Eleventh Amendment. *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 151, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (Stevens, J. dissenting). *See generally* Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv. L.Rev. 1, 3–4 (1963); Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation,* 83 Columbia L.Rev. 1889 (1983); Cor-

dry, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge as Statutory Ex Parte Young Relief: A Response,* 77 Am.Bankr.L.J., part I "Federalism Isn't About Kings" (to be published 2003, advance copy provided).

**3.** *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring).

plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against states, for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting state; and to ascribe to the federal courts, by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable.

*The Federalist Papers*, 413–414 Buccaneer Books, Inc. (1992) (emphasis in original).

The Constitution itself contains no reference to or provision for sovereign immunity of either federal or state government. To the contrary, Article III appears to contemplate federal court jurisdiction over suits against states as defendants by providing in Section 2 in the federal question and state/citizen diversity clauses underscored here:

SECTION 2. *The judicial power shall extend to all cases*, in law and equity, *arising under this Constitution, the laws of the United States, and treaties* made, or which shall be made, under their authority;—to all cases affecting ambassadors, other public ministers and consuls;—to all cases of admiralty and maritime jurisdiction;—to controversies to which the United States shall be a party;—*to controversies* between two or more states;—*between a state and citizens of another state;*—between citizens of different states;—between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects. (emphasis supplied)

The Supreme Court so held in the first case to come before it under the state/citizen diversity clause, *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). *See* the discussion of this case in Erwin Chemerinsky, *Federal Jurisdiction*, 394–395 (3rd ed.1999) (hereafter "Chemerinsky"). This was an action by a South Carolina citizen against the State of Georgia to recover money owed on a contract. All five Justices rendered separate opinions on a case of first impression which was obviously perceived to be of great Constitutional importance. Four of the five (Chief Justice Jay and Justices Cushing, Wilson and Blair) concluded that the federal court had diversity jurisdiction over the suit against the State of Georgia under the express language of Article III, Section 2.[4] Only Justice Iredell dissented, arguing that no act of Congress authorized suits in assumpsit against states and that such suits were not permitted against the

---

4. Of particular interest is the opinion of Chief Justice John Jay, whose analytical approach is summarized at the outset as follows:

The question we are now to decide has been accurately stated, viz, Is a state suable by an individual citizen of another state?

It is said, that Georgia refuses to appear and answer to the Plaintiff in this action, because she is a *sovereign* State, and therefore not *liable* to such actions. In order to ascertain the merits of this objection, let us enquire, 1st. In what sense *Georgia* is a sovereign State.2d. Whether suability is incompatible with such sovereignty.3d. Whether the Constitution (to which Georgia is a party) authorizes such an action against her.
2 U.S. (2 Dall.) at 469–70.

King under English common law.[5]

Driven by the financial implications of the decision for state treasuries burdened by wartime debts, the reaction to *Chisholm* in state governments and Congress was swift, but measured. By March 1794 both Houses of Congress had approved the Eleventh Amendment, which was ratified within a year by the requisite number of states. Chemerinsky at 395.

The Eleventh Amendment provides as follows:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

The Amendment does not mention sovereign immunity, but is narrowly written to overrule *Chisholm* and eliminate that portion of Article III jurisdiction there involved. On its face the Amendment bars jurisdiction only over diversity cases where a state is a defendant, leaving untrammeled Article III federal question jurisdiction ("The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made . . .").[6]

But the impact of the Eleventh Amendment was vastly expanded by the Supreme Court in *Hans v. State of Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). This was a suit by a citizen of Louisiana to recover interest on coupons annexed to bonds issued by the State of Louisiana. Some years after issuance, the State legislature had passed a bill remitting the interest due on the bonds. Claiming that the action of the Louisiana Legislature repudiating the interest obligation on the bonds constituted an impairment of contract in violation of Article I, Section 10 of the Constitution ("No state shall . . . pass any . . . law impairing the obligation of contracts"), Hans brought suit against Louisiana in federal court asserting federal question jurisdiction under Article III, Section 2.

At bottom, the suit was a simple action for breach of contract to recover the interest on the bonds, for which there was no federal jurisdiction under Article III, Section 2. Only the State's putative defense (the Louisiana statute annulling the interest obligation) raised a federal question. Thus, whether or not the Louisiana statute was Constitutionally void, the federal court had no jurisdiction over the contract claim on the bonds, and the action could have been dismissed on that ground.

But it was not. Instead, the Supreme Court addressed the far broader question "whether a State can be sued in a Circuit Court of the United States by one of its own citizens upon a suggestion that the case is one that arises under the Constitution or laws of the United States." *Hans*, 134 U.S. at 9, 10 S.Ct. 504. After discuss-

---

**5.** As noted in Chemerinsky at 394–395, "the four justices in the majority in *Chisholm* had impeccable credentials, especially in discussing the intent behind constitutional provisions. Justices John Blair and James Wilson had been delegates to the Constitutional Convention. Justice William Cushing presided over the state ratification convention in Massachusetts. Chief Justice John Jay was a delegate to the New York ratification convention and one of the authors of the *Federalist Papers*."

**6.** *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts," (Rehnquist, C.J., opinion of the Court); "In precisely tracking the language in Article III providing for citizen-state diversity jurisdiction, the text of the Amendment does, after all suggest to common sense that only the Diversity Clauses are being addressed," *id.* at 110–111, 116 S.Ct. 1114 (Souter, J., dissenting)).

ing the majority opinions in *Chisholm v. Georgia* (which relied on the explicit language of Article III, Section 2) and emphasizing the fact that the result in *Chisholm* was overruled by the Eleventh Amendment, the Court said that "this fact lends additional interest to the able [dissenting] opinion of Mr. Justice Iredell on that occasion." *Id.* at 12, 10 S.Ct. 504. The Court recognized that the Eleventh Amendment by its terms did not reach the question presented, involving the assertion of federal question jurisdiction by a citizen of the state being sued. The Court also appeared to acknowledge that the federal question clause of Article III, Section 2 on its face conferred jurisdiction over the suit as the Court held in *Chisholm* regarding the state/citizen diversity clause, conceding that "[a]dhering to the mere letter, it might be so; and so, in fact, the Supreme Court held in *Chisholm v. Georgia.*" *Id.* at 13–14, 10 S.Ct. 504. But after reciting the portion of Hamilton's Federalist No. 81, quoted above, and a similar quotation from a speech during the ratification debates by James Madison, the Court concluded that Justice Iredell's dissent in *Chisholm* was a correct statement of the law and that Louisiana could not be sued.

In short, the Supreme Court in *Hans* held that the suit was barred, not by looking to the Eleventh Amendment or elsewhere in the Constitution, but under the doctrine of sovereign immunity by "looking at the subject as Hamilton did, as Mr. Justice Iredell did, in the light of history and experience and the established order of things" and concluding that "the views of [Justice Iredell] were clearly right—as the people of the United States in their sovereign capacity subsequently decided [referring to the Eleventh Amendment]."

*Id.* at 14, 10 S.Ct. 504. Implicit if not explicit in the Court's opinion are the underlying premises (i) that the attributes of sovereignty including sovereign immunity continued to inhere in the states unless explicitly excluded by the Constitution and (ii) that the explicit jurisdictional grants in Article III, Section 2 cannot be construed in historical context to mean what the words say.

Thus, by the *Hans* decision the states' immunity from suit was established in Supreme Court jurisprudence, despite (i) the lack of any reference to or provision for immunity in the Constitution, (ii) the broad and explicit grant of federal question jurisdiction in Article III, Section 2, (iii) the supremacy clause in Article VI[7] and (iv) the limited scope of the language employed in the Eleventh Amendment to exclude only state/citizen diversity jurisdiction.

Two circumstances in which sovereign immunity may not be successfully invoked survived both the Eleventh Amendment and the *Hans* decision. The senior of the two, long predating the American experience, is consent to be sued or waiver. The other was a unique product of the Constitutional bifurcation of sovereignty, the abrogation of state sovereign immunity by Act of Congress.

Prior to the landmark decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court had recognized two Constitutional bases for Congressional abrogation of state sovereign immunity. The first is the express grant of authority in Section 5 of the Fourteenth Amendment, which provides that "[t]he Congress shall have power to enforce, by appropriate leg-

---

7. "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

islation, the provisions of this article." *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), *reaffirmed in Seminole*, 517 U.S. at 59, 116 S.Ct. 1114. As amplified in point II C below, this Constitutional avenue for abrogation survives but has been narrowly circumscribed by post-*Seminole* Supreme Court rulings.

The second source of Constitutional authority for abrogation of sovereign immunity was Article I, Section 8, defining Congressional powers. The seminal, and only, decision was *Pennsylvania v. Union Gas Company*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).[8] In *Union Gas*, the United States sued Union Gas to recover environmental clean-up costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). Union Gas filed a third-party complaint against Pennsylvania asserting that the Commonwealth was responsible under CERCLA for at least a portion of the costs. The District Court dismissed the third-party complaint against Pennsylvania as barred by the Eleventh Amendment and this was affirmed by the Third Circuit Court of Appeals. While Union Gas' petition for *certiorari* was pending, Congress amended CERCLA by passing the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), after which the Supreme Court granted *certiorari*, vacated the Court of Appeals' decision and remanded for reconsideration in light of the SARA amendments. On remand, the Court of Appeals held that the express language of CERCLA as amended by SARA clearly demonstrated Congress' intent to render states liable for monetary damages, thereby abrogating sovereign immunity, and that Congress had the power to do so when legislating pursuant to the interstate commerce clause (Article I, Section 8, Clause 3).

The Supreme Court granted *certiorari* a second time in *Union Gas* and affirmed by divided and split plurality votes.[9]

---

**8.** There were one earlier and two contemporaneous decisions in which the Supreme Court acknowledged the proposition that Congress, acting within the scope of its Constitutional powers under Article I, Section 8, had the power to abrogate state sovereign immunity, if the Congressional intent to abrogate was made unmistakably clear in the statute. *See Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 243, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself"); *Dellmuth v. Muth*, 491 U.S. 223, 230, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (after quoting from *Atascadero*, the Court said "... we reaffirm today that in this area of the law, evidence of congressional intent must be both unequivocal and textual"). In each of these cases the majority opinion asserted that Congress had the power to abrogate sovereign immunity but concluded that the intent to do so had not been made unmistakably clear in the language of the statute (the Rehabilitation Act of 1973 in *Atascadero*, 473 U.S. at 235, 105 S.Ct. 3142, the Education of the Handi-

capped Act in *Dellmuth*, 491 U.S. at 225, 109 S.Ct. 2397). In *Hoffman v. Connecticut Department of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) three of the five members of the majority (Chief Justice Rehnquist and Justices White and Kennedy) reached the same result on the same rationale, with two Justices (O'Connor and Scalia) concurring but on the ground that Congress had no power to abrogate sovereign immunity under the Constitution's bankruptcy clause (Article I, Section 8, Clause 4).

**9.** Justice Brennan delivered the opinion of the Court, joined by Justices Marshall, Blackmun, and Stevens, concluding that CERCLA as amended by SARA unambiguously manifested the intent of Congress to abrogate the states' sovereign immunity, and that Congress had the Constitutional power to do so under the interstate commerce clause. Justice Stevens wrote a separate concurring opinion. Justice Scalia wrote an opinion joining in that portion of Justice Brennan's opinion holding that CERCLA as amended by SARA clearly ren-

The fragmented consensus reached in *Union Gas* collapsed when the then minority of Chief Justice Rehnquist and Justices O'Connor, Scalia, and Kennedy was joined by Justice Thomas in the decision in *Seminole*. The case arose under the Indian Gaming Regulatory Act passed by Congress under the Indian commerce clause of the Constitution, Article I, Section 8, Clause 3. The Act imposes upon states a duty to negotiate in good faith with an Indian tribe toward the formation of a valid contract between the tribe and the state in which gaming activities are to be conducted. The Act made it unmistakably clear that the United States District Courts "shall have jurisdiction" over any cause of action initiated by a tribe against a state to enforce the provisions of the Act. The Seminole Tribe argued that Congress, through the Act, abrogated the State's immunity from suit. The Court quoted from *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) in articulating the two questions determinative of the issue: "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity' ...; and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Seminole*, 517 U.S. at 55, 116 S.Ct. 1114. All nine Justices agreed that the Act clearly and unmistakably manifested Congress' intent to abrogate sovereign immunity.

The issue thus turned on the second question, whether Congress acted pursuant to a valid exercise of Constitutional power. Of the two Constitutional provisions previously recognized as authority to abrogate, Section 5 of the Fourteenth Amendment was not applicable. That left the interstate commerce clause, Article I, Section 8, Clause 3, as held in the plurality decisions in *Union Gas*. Finding no principled basis to distinguish between the interstate commerce clause and the Indian commerce clause (indeed, observing that the Indian commerce clause, if anything, "accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause," *id.* at 62, 116 S.Ct. 1114) the Court proceeded to an analysis of *Union Gas* and its legal antecedents. Noting that the decision "has, since its issuance, been of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality," the majority, newly constituted since the plurality decision in *Union Gas* seven years before, concluded "that *Union Gas* was wrongly decided and that it should be, and now is, overruled." *Id.* at 66, 116 S.Ct. 1114. Justice Souter wrote a compendious dissenting opinion in *Seminole*, in which Justices Stevens, Ginsburg and Breyer joined, and Justice Stevens

ders states liable for money damages in private suits, thereby creating a majority on that issue. But Justice Scalia dissented from Justice Brennan's conclusion that Congress had the power under the interstate commerce clause of Article I to abrogate sovereign immunity and was joined in this dissent by the Chief Justice, Justice O'Connor and Justice Kennedy. Justice White, joined by the Chief Justice, Justice O'Connor, and Justice Kennedy dissented from Justice Brennan's conclusion that CERCLA as amended by SARA clearly manifested Congressional intent to abrogate sovereign immunity. However, since a

majority of the Court (including Justice Scalia) had reached the opposite conclusion on this question, Justice White accepted that judgment and, on that basis, joined Justice Brennan's conclusion that Congress had the authority under Article I to abrogate the Eleventh Amendment immunity of the states, thereby creating a majority on that issue. Justice O'Connor agreed with Justice Scalia that Congress does not have the power to abrogate sovereign immunity under Article I, and agreed with Justice White that CERCLA and SARA did not manifest a clear Congressional intent to abrogate sovereign immunity.

wrote a separate dissenting opinion.[10]

*Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) further illuminates the dichotomy in the Supreme Court on the issue of sovereign immunity. Plaintiffs, probation officers employed by the State of Maine, sued the State in United States District Court for the District of Maine seeking compensation and liquidated damages for alleged violation by the State of the overtime provisions of the federal Fair Labor Standards Act of 1938. After the decision in *Seminole,* the District Court dismissed the action. Plaintiffs then filed the same action in state court. The state trial court dismissed the suit on the basis of sovereign immunity, and the Maine Supreme Judicial Court affirmed. Because the Maine Supreme Judicial Court's decision conflicted with the decision of the Supreme Court of Arkansas in *Jacoby v. Arkansas Department of Education,* 962 S.W.2d 773, 331 Ark. 508 (1998), the Supreme Court granted *certiorari* and affirmed in *Alden.* Writing for the majority in a lengthy opinion joined by Chief Justice Rehnquist and Justices O'Connor, Scalia, and Thomas, Justice Kennedy said:

> We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts. We decide as well that the State of Maine has not consented to suits for overtime pay and liquidated damages under the FLSA. On these premises we affirm the judgment sustaining dismissal of the suit.

### I

The Eleventh Amendment makes explicit reference to the States' immunity from suits "commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amdt. 11. We have, as a result, sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

*Alden,* 527 U.S. at 712–713, 119 S.Ct. 2240. Justice Souter again dissented in a lengthy opinion in which Justices Stevens, Ginsburg and Breyer joined.

■ The majority and dissenting opinions in *Seminole* and *Alden* represent extraordinary exegeses of conflicting historical, legal and political analysis and theory. Suffice it here to say that the present five-member majority of the Court embraces a theory holding that the Eleventh Amendment, although narrowly drawn to overrule the *Chisholm* decision, confirms a basic "presupposition" that the states enjoyed sovereign immunity as an aspect of their sovereignty before the union and that it

---

**10.** The implications of *Seminole* in the bankruptcy context were immediately recognized by scholars. *See, e.g.,* Gibson, *Sovereign Im-* *munity in Bankruptcy: The Next Chapter,* 70 Am.Bankr.L.J. 195 (1996).

was not contemplated that the Constitution would eliminate sovereign immunity.[11] As stated by the majority in *Alden*, "sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself," *id.* at 728, 119 S.Ct. 2240, and "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today...." *Id.* at 713, 119 S.Ct. 2240. Moreover, this immunity cannot be abrogated by Congress under the powers granted to it in Article I; Constitutional authority to abrogate is found only in Section 5 of the Fourteenth Amendment.

The minority view, as reflected in Justice Stevens' and Justice Souter's dissents, is that the *Chisholm* decision (applying the state/citizen diversity clause of Article III, Section 2 as written) was correct albeit subsequently overruled by the Eleventh Amendment, and that *Hans* (declining to apply the federal question clause as written) was wrongly decided. Further, this view would hold that the penumbral "presupposition" of sovereign immunity expounded in *Hans* and many subsequent

Supreme Court decisions is a judicial construct which exceeds the narrow confines of the Eleventh Amendment and cannot be found in the Constitution; that sovereign immunity under English common law has long been subject to legislative abrogation; and that Congress must have the power to abrogate a judicially-created immunity in order to vindicate the primacy of the Constitutional precepts mandated in the supremacy clause in Article VI, the general powers clauses in Article I, Section 8,[12] and federal question jurisdiction under Article III, Section 2. *See* Chemerinsky at 396–402.

Of specific relevance to the issue before this Court, the question remains whether the rationale of the majority in *Seminole* and *Alden* will be applied in suits brought against states under the Bankruptcy Code. Two preliminary points should be noted before addressing the case law and the parties' contentions.

First, Clause 4 of Article I, Section 8 grants Congress the power "to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States." Clause 4 is the only powers clause in Article I,

---

**11.** Thus, the Court said in *Seminole*, 517 U.S. at 54, 116 S.Ct. 1114:

> Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). That presupposition, first observed over a century ago in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that " '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,' " *id.*, at 13, 10 S.Ct. 504 (emphasis deleted), quoting The Federalist

No. 81, p. 487 (C. Rossiter ed. 1961) (A.Hamilton). See also *Puerto Rico Aqueduct and Sewer Authority, supra*, at 146, 113 S.Ct. 684 ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity"). For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans, supra*, at 15, 10 S.Ct. 504 (footnote omitted).

**12.** Including the "necessary and proper" clause in Clause 18, granting Congress power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers...."

Section 8 to use the word "uniform" (although the duties, imposts and excises Congress is empowered to levy under Clause 1 are required to be "uniform throughout the United States," and Clause 17 empowers Congress "to exercise exclusive legislation" over what became the District of Columbia). The unique use of the word "uniform" with respect to Congress' power to establish the law on naturalization and bankruptcies must raise the question whether the naturalization and bankruptcy power is to be viewed in a manner different from the other powers granted under Article I, Section 8.

Second, Section 106 of the Bankruptcy Code was amended in 1994 to provide unambiguously for abrogation of sovereign immunity in connection with a host of specified Code provisions, including Section 505. This amendment, if enacted prior to 1989, presumably would have reversed the outcome reached by the then majority in *Hoffman v. Connecticut Department of Income Maintenance* (cited in footnote 8, above).

The jurisdictional question debated by most courts and scholars since *Seminole* is whether the decisions in *Seminole* and *Alden* barring Congressional abrogation of sovereign immunity under the Article I, Section 8 powers there involved would be equally applicable to Congress' abrogation of sovereign immunity in Section 106 of the Bankruptcy Code under the bankruptcy clause. Five courts of appeals have ruled that, after *Seminole*, suits against the states arising under the Bankruptcy Code are barred by sovereign immunity.

*Schlossberg v. State of Maryland (In re Creative Goldsmiths of Washington, D.C., Inc.)*, 119 F.3d 1140 (4th Cir.1997), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998); *Dep't of Transp. & Dev., State of Louisiana v. PNL Asset Mgmt. Co., LLC (In re Fernandez)*, 123 F.3d 241, *corrected*, *rehearing denied*, 130 F.3d 1138 (5th Cir.1997); *Sacred Heart Hosp. of Norristown v. Pennsylvania (In re Sacred Heart Hospital of Norristown)*, 133 F.3d 237 (3d Cir.1998); *Mitchell v. Franchise Tax Bd., State of California (In re Mitchell)*, 209 F.3d 1111 (9th Cir.2000); *Nelson v. La Crosse County Dist. Attorney (State of Wisconsin) (In re Nelson)*, 301 F.3d 820 (7th Cir.2002).

One Court of Appeals decision, "[a]pplying the analysis that the Supreme Court set forth in *Seminole Tribe*, [concluded] that Article I, Section 8 of the Constitution gives Congress the power to abrogate states' sovereign immunity" in the context of the Bankruptcy Code. *Hood v. Tennessee Student Assistance Corp. (In re Hood)*, 319 F.3d 755, 758 (6th Cir.2003).

## II. The debtors' arguments on sovereign immunity

### A. Surrender of immunity under the "plan of the convention"

Hamilton, in that portion of Federalist No. 81 quoted above, posited that sovereign immunity would remain with the states "[u]nless ... there is a surrender of this immunity in the plan of the convention." The Supreme Court has repeatedly acknowledged this limitation on sovereign immunity.[13] But the Supreme Court since

**13.** *See, e.g., Hans,* 134 U.S. at 12–13, 10 S.Ct. 504, quoting Federalist No. 81; *Seminole,* 517 U.S. at 68, 116 S.Ct. 1114, "save where there has been 'a surrender of this immunity in the plan of the convention' " (quoting *Principality of Monaco v. Mississippi,* 292 U.S. 313, 322–323, 54 S.Ct. 745, 78 L.Ed. 1282 (1934)),

quoting Federalist No. 81; *Alden v. Maine,* 527 U.S. at 713, 119 S.Ct. 2240, "except as altered by the plan of the Convention," at 717, quoting from Federalist No. 81, at 730 "save where there has been 'a surrender of this immunity in the plan of the convention' "

*Seminole* has not had occasion to rule on the assertion of jurisdiction over state entities in a federal question claim arising under the Bankruptcy Code. Nor has the Supreme Court ever considered the question whether state sovereign immunity was surrendered with respect to bankruptcy jurisdiction in the plan of the convention.

Both the Sixth Circuit in *In re Hood* and the Bankruptcy Court in *Bliemeister v. Industrial Commission of Arizona (In re Bliemeister)*, 251 B.R. 383 (Bankr.D.Ariz. 2000), *aff'd on other grounds*, 296 F.3d 858 (9th Cir.2002) [14] addressed this question, and each concluded in substance that sovereign immunity was either abrogated as a result of, or surrendered in, the plan of the convention. It is on these decisions that the debtors rely.

*Hood* and *Bliemeister* each involved the debtor's discharge in bankruptcy. *Hood* was an adversary proceeding brought by the debtor to declare her education loan dischargeable under the "undue hardship" provision of 11 U.S.C. § 523(a)(8). In *Bliemeister* the debtor brought an adversary proceeding against a state agency to enforce the debtor's discharge in respect of a debt which the state agency sought to collect in violation of the discharge. Discussion of the opinions of the Sixth Circuit and the bankruptcy court in *Hood* and *Bliemeister* is unnecessary here, beyond a brief summary of the core of their common analysis.

Both courts proceed from the paragraph from Hamilton's Federalist No. 81 quoted above and relied upon by the Supreme Court in *Hans, Seminole, Alden* and countless other decisions. Hamilton stated that "Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states...." In the very next sentence Hamilton said "The circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here." [15] The discussion of the taxation article referred to appeared in Federalist No. 32, also written by Hamilton, which described the circumstances in which sovereignty would be surrendered in the plan of the convention. In Federalist No. 32 Hamilton identified three cases where the alienation of state sovereignty would result in a surrender of immunity: first, "where the Constitution in express terms granted an exclusive authority to the Union"; second, "where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority"; and third, "where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*" (emphasis in original).

As an example of the third case of surrender of sovereignty, Hamilton states in the same paragraph:

also quoting from *Principality of Monaco* and Federalist No. 81.

**14.** The bankruptcy court in *Bliemeister* rejected the sovereign immunity defense on three grounds, (i) surrender under the plan of the Convention, discussed here, (ii) the so-called *in rem* exception and (iii) waiver of immunity by reason of the Commission's participation in the proceeding. The District Court and the Court of Appeals for the Ninth Circuit affirmed on the third ground, waiver of immu-

nity, without reaching the merits of either the first or the second.

**15.** Some have suggested that the "alienation of state sovereignty" referred to in this sentence and explained in Federalist No. 32 was not intended by Hamilton to include a surrender of immunity. However, the juxtaposition of this sentence with the immediately preceding reference to "a surrender of this immunity" undermines such an argument.

The third will be found in that clause, which declares that Congress shall have power "to establish an UNIFORM RULE of naturalization throughout the United States." This must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE there could be no UNIFORM RULE.

The clause identified by Hamilton in Federalist No. 32 to illustrate the third case where state sovereign immunity would be surrendered is, of course, Clause 4 of Article I, Section 8, the same Clause that grants Congress the power to establish "uniform laws on the subject of bankruptcies throughout the United States." There is no principled basis to distinguish between the necessity for an uniform rule of naturalization and uniform laws on the subject of bankruptcies. As a practical matter, it cannot be gainsaid that states' rights to either legislate or invoke sovereign immunity in defiance of bankruptcy laws is "totally *contradictory* and *repugnant*" to the Constitutional mandate to Congress to establish "uniform laws on the subject of bankruptcies throughout the United States," particularly considering the fact that states are important creditors in many if not most bankruptcies other than predominantly consumer cases under Chapter 7 or Chapter 13.

The bankruptcy court in *Bliemeister* also points out that the second case identified by Hamilton resulting in surrender of sovereign immunity is also applicable with respect to the bankruptcy clause. This is so because the power to legislate with respect to bankruptcy necessarily and inevitably entails the power to modify contract rights, a power which is expressly prohibited to the states by the impairment of contracts provision in Article I, Section 10. For a study of these issues, *see* Gerson, *A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting the*

*Seminole Tribe Doctrine*, 74 Am. Bankr. L.J. 1 (2000).

Although similar in their analyses of Hamilton's exposition of the surrender of sovereign immunity in Federalist Nos. 81 and 32, the courts in *Hood* and *Bliemeister* diverge in the ultimate conclusion to be drawn from Hamilton's analysis. The Sixth Circuit concluded in *Hood* that "applying the analysis that the Supreme Court set forth in *Seminole Tribe*, we conclude that Article I section 8 of the Constitution gives Congress the power to abrogate states' sovereign immunity" in the context of the bankruptcy clause. *In re Hood*, 319 F.3d at 758. The Bankruptcy Court in *Bliemeister* concluded that because the states surrendered their sovereign immunity under the second and third cases identified by Hamilton in Federalist No. 32, abrogation of immunity is unnecessary, saying: "Congress did not need to adopt 11 U.S.C. § 106 [the abrogation provision of the Bankruptcy Code], because the states' sovereignty had been abrogated in the original Constitution once the federal government elected to enact bankruptcy laws." *In re Bliemeister*, 251 B.R. at 391–392. The conclusion reached in *Bliemeister* appears to follow as the logical consequence of the rationale employed in both decisions under Federalist Nos. 81 and 32. The "surrender of immunity" conclusion in *Bliemeister* avoids confrontation with the apparent view of the Supreme Court majority in *Seminole* and *Alden* that sovereign immunity cannot be abrogated by Congress acting under its Article I powers, while adhering faithfully to the Supreme Court's analytical approach from *Hans* through *Seminole* and *Alden* in predicating state sovereign immunity on Federalist No. 81 *unless* "there is a surrender of this immunity in the plan of the convention."

The analysis in *Hood* and *Bliemeister* of Hamilton's expositions in Federalist Nos.

81 and 32 leading to the conclusion in *Bliemeister* that sovereign immunity was surrendered in the plan of the convention with respect to Congress' power to enact uniform laws of naturalization and bankruptcy does not conflict with any Supreme Court decision on the subject of the Eleventh Amendment and sovereign immunity. Indeed, the Supreme Court has never had occasion to consider the Federalist Nos. 81 and 32 analysis in the context of the bankruptcy power.

Moreover, there is an important difference in the posture and exposure of the states in the leading Supreme Court cases dealing with the Eleventh Amendment and sovereign immunity, on the one hand, and that of the states in adversary proceedings or contested matters in the bankruptcy court arising under the Bankruptcy Code. In *Chisholm, Hans* and most of the *Hans* progeny over the last 114 years the states were sued and liability was sought to be imposed on state treasuries as debtors to or obligors of the respective plaintiffs. By contrast, in any proceeding or contested matter against a state or state entity arising under the Bankruptcy Code (such as in both *Hood* and *Bliemeister*), the state or state entity must needs be drawn into controversy not for the purpose of imposing a liability on the state treasury, but because of the state's or state entity's relationship as a *creditor* of a debtor in bankruptcy. The difference is of great materiality when viewed in light of the elusive historical antecedents of the American doctrine of sovereign immunity and the Eleventh Amendment.[16] The significance of the fiscal danger of imposing liabilities on state treasuries as a central underpinning

of sovereign immunity is nowhere better articulated than in the following excerpt from the majority opinion in *Alden:*

> Private suits against non-consenting States—especially suits for money damages—may threaten the financial integrity of the States.... Even today, an unlimited congressional power to authorize suits in state court to levy upon the treasuries of the States for compensatory damages, attorney's fees, and even punitive damages could create staggering burdens, giving Congress a power and a leverage over the States that is not contemplated by our constitutional design....
>
> \* \* \*
>
> A general federal power to authorize private suits for money damages would place unwarranted strain on the States' ability to govern in accordance with the will of their citizens.... While the judgment creditor of a State may have a legitimate claim for compensation, other important needs and worthwhile ends compete for access to the public fisc. Since all cannot be satisfied in full, it is inevitable that difficult decisions involving the most sensitive and political of judgments must be made. If the principle of representative government is to be preserved to the States, the balance between competing interests must be reached after deliberation by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government and invoked by the private citizen.

---

**16.** Consider the facts (i) that Hamilton's seminal passage on immunity in Federalist No. 81 was provoked by "alarm" that out-of-state citizens could sue a state in federal court to recover on the state's public securities; (ii) that the Eleventh Amendment was the prod- uct of widespread concern over the impact on state treasuries of war debts resulting from the *Chisholm* decision; and (iii) that *Hans* was decided in the context of post-reconstruction southern political reaction to or repudiation of reconstruction era state debts.

*Alden,* 527 U.S. at 750–751, 119 S.Ct. 2240. As explained in the text immediately below, the limited surrender of immunity resulting from the uniformity requirement of the bankruptcy clause does not implicate the danger of exposing state treasuries to liabilities on claims, because the surrender of immunity applies only to proceedings *arising under* the Bankruptcy Code. The only claim arising under the Bankruptcy Code which could be asserted against a state would be a claim based upon its status or conduct *as a creditor,* not as a putative defendant with independent liability to the debtor.

Lacking any ruling on the issue by the Supreme Court or the Court of Appeals for the Second Circuit, I would agree with the conclusion reached in *Bliemeister* and would, in a proper case, hold that the federal courts have jurisdiction over state entity defendants in proceedings *arising under* the Bankruptcy Code.

*But this is not such a case.*

In a critique of the Sixth Circuit decision in *Hood,* Professor Brubaker has suggested that the decision could expose state entities to a "potentially boundless array of federal-court suits."

> Forging an Article I, federal forum-based bankruptcy exception to state sovereign immunity may also prove overly ambitious. The scope of federal bankruptcy jurisdiction under such an Article I theory has no readily discernible limits. *See* Brubaker, *supra,* at 807–13. Such a theory, therefore, could subject states to a vast and potentially boundless array of federal-court suits in the name of Congress' federal forum power in bankruptcy. Indeed, in all of the various arguments for a bankruptcy exception to the state sovereign immunity, there is little to no discussion of a limiting principle for such a bankruptcy exception.

Brubaker, *Abrogation of State Sovereign Immunity Through Congress' Bankruptcy Power: Considering the Framers' Intent With Respect to the Attributes of Sovereignty, Uniformity, and Bankruptcy Exceptionalism,* Vol. 23, No. 3 Bankruptcy Law Letter, 9 (March 2003) ("Brubaker II").

This Court agrees with the concern expressed in this passage, but not that the jurisdiction articulated in *Hood* and *Bliemeister* "has no readily discernible limits" or that there is no "limiting principle" for federal court bankruptcy jurisdiction over state entities. The "limiting principle" for jurisdiction over states under the bankruptcy clause of the Constitution is the Bankruptcy Code itself. Jurisdiction predicated on Congress' Constitutional power to establish uniform bankruptcy laws must be limited to substantive claims *arising under the bankruptcy laws* promulgated in pursuance of this Constitutional authority.

■■■ In these adversary proceedings the debtors ask this Court to determine the fair market value of the debtors' Taxable Property *under state law.* Section 505 of the Bankruptcy Code permits the court in a bankruptcy case to make determinations of tax liability under federal or state tax laws. But a proceeding under Section 505, while authorized by the Bankruptcy Code, is not a proceeding or claim *arising under* any provision of the Bankruptcy Code. The substantive determination to be made in a Section 505 proceeding is one arising under and must be made in accordance with the relevant provisions of state or federal tax law. A debtor's claim under federal or state tax law, like claims by or against a debtor arising under state or federal common law or statutes other than the Bankruptcy Code, may be within the non-exclusive jurisdiction of federal district or bankruptcy courts under 28

U.S.C. §§ 1334(b) and 157(a), but they do not fall within the limits of the power to establish bankruptcy laws under Article I, Section 8, Clause 4.

The uniformity requirement of the bankruptcy clause necessarily requires surrender of state immunity because the Bankruptcy Code cannot be uniform throughout the United States if the Code cannot be enforced by proceedings against the states in their often critical role as creditors.[17] But the uniformity requirement of the bankruptcy clause does not apply to claims against states under tax laws, other federal or state statutes or the common law. State sovereign immunity is not Constitutionally surrendered, waived or abrogated with respect to such claims even if such claims could be asserted in bankruptcy court but for state immunity.

Accordingly, the debtors' "surrender of immunity under the plan of the convention" argument, while valid as to claims arising under the Bankruptcy Code, does not apply to claims arising under state tax laws.

## B. *In rem jurisdiction*

 The debtors' reliance on *in rem* jurisdiction is misplaced. Simply stated, a proceeding to determine the amount of a tax assessment, or the calculation of a tax, does not entail an adjudication of conflicting claims to a *res*. An adversary proceeding under Section 505, which does not resolve a disputed proof of claim filed by the taxing authority, is an *in personam* suit against the taxing authority, not *in rem*.

The concept of *in rem* jurisdiction is that the court has jurisdiction over *property*, a *res*, and is thereby empowered to adjudicate interests in the *res*. See 21 C.J.S. *Courts* § 50 et al., in general (August 2002) (footnotes omitted; emphasis added) ("Conceptually, *in rem* jurisdiction is based upon a court's control over a *res* rather than over a defendant as a person. *In rem* jurisdiction is adequate where the basis of the relief sought involves only defendant's status or action vis-a-vis specific tangible property or a specific tangible thing which is subject to the court's

---

17. As stated in Brubaker II at 8:

Of course, the concurrent propositions of states' sovereign immunity *and* Congress' plenary legislative powers are at cross purposes with one another. Congress' Article I power to regulate the conduct of the states is inevitably undermined to the extent the states retain an immunity from suits to enforce valid federal laws.... State sovereign immunity's characteristic translation problem, engendered by our federalism, is presented in especially sharp relief in the context of Congress' power "[t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Indeed, if we do not leave the realm of abstract reasoning one can argue persuasively (consistent with a bankruptcy exceptionalism theory) that federal bankruptcy law itself must be considered among the "limits ... implicit in the Constitutional principle of state sovereign immunity" (*Alden*, 527 U.S. at 755,

119 S.Ct. 2240), because the very nature of bankruptcy "laws" is more procedural than substantive.

But the concern here is not merely in the realm of abstract reasoning, nor is bankruptcy law more procedural than substantive. The Bankruptcy Code prescribes a carefully conceived, interdependent scheme of rights, priorities, entitlements, obligations, and consequences, including the discharge in bankruptcy, the automatic stay, preference and other avoidance powers, and the like, which are substantive, not merely procedural. Anyone familiar with this statutory scheme in practice knows that the Bankruptcy Code *cannot* be administered as a "uniform" body of law if it cannot be enforced in appropriate proceedings against states acting in violation of the Bankruptcy Code. *See generally* the comprehensive analysis in Brubaker I; Klee, Johnston and Winston, *State Defiance of Bankruptcy Law*, 52 Vand. L.Rev. 1527 (1999).

control, and the nature of the remedy pursued is limited to affecting defendant's interest in that *res* "); *Black's Law Dictionary* 900 (4th ed.1951) (*in rem* is defined as a "technical term used to designate proceedings or actions instituted *against the thing*, in contradistinction to personal actions, which are said to be *in personam*").

■ A party having or claiming an interest in the *res*, given notice of the proceeding, may choose to appear in the proceeding to assert its rights, thereby subjecting itself to the limited *in rem* jurisdiction of the court, *see Cunningham v. Macon & Brunswick R. Co.,* 109 U.S. 446, 451–52, 3 S.Ct. 292, 27 L.Ed. 992 (1883), or it may choose not to do so. Either way, the party given notice will be bound by the judgment of the court with respect to property rights in the *res*. *See In re Nelson,* 301 F.3d at 837 ("[A] State may very well have its rights affected by a bankruptcy proceeding. . . . The state, of course, may well choose not to appear in federal court. But that choice carries with it the consequence of foregoing any challenge to the federal court's actions."); 1 *James Wm. Moore et al., Moore's Manual: Federal Practice and Procedure* § 6.29 (2003). ("In a 'true' in rem action, the court determines all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is one against all others in the world. The practical effect of such an action is to establish an absolute title to the property because no one may later claim exemption from the effect of the judgment on the ground that the court lacked jurisdiction"); Leonard H. Gerson, *A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting The Seminole Tribe Doctrine,* 74 Am. Bankr.L.J. 1, 30 (Winter, 2000) (*in rem* jurisdiction "is a centu-

ries-old doctrine used to determine ownership interests in property as 'against the world.' . . . [I]t is a common law jurisdictional tool, not a product of constitutional analysis").

■ *In rem* jurisdiction does not entail the assertion of a claim against a person, it involves assertion of claims against the *res*. Thus, to say that a bankruptcy court has *in rem* jurisdiction over a state that has filed a claim in a bankruptcy case is in no way the assertion of a claim against the state. It is an assertion of the power of the court to adjudicate claims (including the state's claim) against the subject property.

The Supreme Court decision in *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), relied upon by the debtors, is helpful in understanding *in rem* jurisdiction of the bankruptcy court, although it does not support the debtors' claim to *in rem* jurisdiction over the Section 505 tax assessment appraisal proceedings. In *Gardner,* the State of New Jersey filed a proof of claim for $19.7 million of unpaid taxes and interest in the bankruptcy case of debtor The Central Railroad Company of New Jersey, of which Gardner was the trustee, asserting that under New Jersey law the sums owed were secured by " 'a lien paramount to all other liens upon the lands and tangible property and franchises of the company in this State.' " 329 U.S. at 570, 67 S.Ct. 467. After the trustee filed a petition for adjudication of New Jersey's tax claims and the trustee's objections thereto, the Attorney General of New Jersey entered a special appearance claiming that "the entertainment of the petition would constitute a prohibited suit against the State, both as respects the determination of the amount of the claim and its priority or lien." *Id.* at 571, 67 S.Ct. 467. The Supreme Court held "contrary to the position of New Jersey, that the reorgani-

zation court had jurisdiction over the proof and allowance of the tax claims and that the exercise of that power was not a suit against the State." *Id.* at 572, 67 S.Ct. 467. Writing for the Court, Justice Douglas said:

It is traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure. [citation omitted] If the claimant is a State, the procedure of proof and allowance is not transmuted into a suit against the State because the court entertains objections to the claim. The State is seeking something from the debtor. No judgment is sought against the State. *The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res.* It is none the less such because the claim is rejected *in toto*, reduced in part, given a priority inferior to that claimed, or satisfied in some way other than payment in cash. When the State becomes the actor and files a claim against the fund, it waves any immunity which it otherwise might have had respecting the adjudication of the claim. [citations omitted]

The extent of the constitutional authority of the bankruptcy court in this respect was passed upon in *New York v. Irving Trust Co.*, 288 U.S. 329 [53 S.Ct. 389, 77 L.Ed. 815 (1933)]. In that case the Court sustained an order of the bankruptcy court which barred a State's tax claim because not filed within the time fixed for the filing of claims. The Court stated, p. 333 "If a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power; otherwise, orderly and expeditious proceedings would be impossible and a fun-

damental purpose of the Bankruptcy Act would be frustrated."

In the present circumstances there is, therefore, no collision between § 77 and the Constitution.

329 U.S. at 573–574, 67 S.Ct. 467 (emphasis supplied).

■ Like the Bankruptcy Act, the Bankruptcy Code provides that the commencement of a case under the Code creates an "estate" comprised of all of the debtor's property. 11 U.S.C. § 541. The debtor's estate is a *res*. Accordingly, as explicated in *Gardner*, all aspects of administration of the debtor's estate are properly deemed proceedings *in rem*, including marshaling the assets, resolving contested matters concerning claims filed against the estate, security interests (liens) asserted in the estate property, violations by a state of the automatic stay and the like, and distribution of the estate property.

Thus, the debtors are correct in asserting that *in rem* jurisdiction exists with respect to the administration of the debtors' estates. If the state defendants in these adversary proceedings had filed proofs of claim for taxes owed by the debtors' estates, the states would have thereby subjected themselves to the *in rem* jurisdiction of this Court, at least to the extent of adjudicating all objections to such claims, including the objection that a state agency appraised property at excessive value for tax purposes. However, none of the state defendants has filed a proof of claim in the debtors' bankruptcy cases. Nor are the Section 505 adversary proceedings objections to claims filed against the debtors' estates.

In these adversary proceedings the debtors ask this Court only to determine the value of the debtors' Taxable Property for purposes of determining tax assessments under state law. Jurisdiction over

the state defendants is *in personam*, not *in rem*. The Section 505 complaints do not constitute *in rem* proceedings because evaluation for assessment purposes does not and cannot determine or affect any property rights in the Taxable Property. It is true, of course, that the appraisal and assessment process concerns property of the debtors' estates, but a bankruptcy court's *in rem* jurisdiction over a debtor's property is limited to the bankruptcy *administration* of that property, to wit, the adjudication of interests in and the disposition of the debtor's property. Merely calculating state and local taxes by evaluation, appraisal or assessment of property (i) does not affect the property itself, (ii) does not affect the debtor's, trustee's or anyone else's right, title or interest in or to the property, (iii) does not affect the debtor's estate, and (iv) has nothing to do with bankruptcy administration or the *in rem* jurisdiction of the bankruptcy court. *In rem* bankruptcy jurisdiction is invoked only when a tax claim is filed or the taxing authority takes affirmative steps to collect taxes from or impose a lien upon property of the debtor's estate.

In short, these adversary proceedings to evaluate the Taxable Property for assessment are not *in rem* proceedings, and this Court cannot assert *in personam* jurisdiction over the state defendants in defiance of the Eleventh Amendment or sovereign immunity as declared by the Supreme Court.

## C. *Abrogation of sovereign immunity under Section 106(a)*

 Congress' power to abrogate sovereign immunity under the general powers clauses of Article I, Section 8 was definitively rejected by the Supreme Court in *Seminole* and *Alden*. Recognizing this, the debtors look to Section 5 of the Fourteenth Amendment as Constitutional authority for Congress to enact Section 106(a) of the Bankruptcy Code, abrogating sovereign immunity with respect to Section 505 and many other specified provisions of the Code. However, beginning in 1997 the Supreme Court rendered a series of decisions limiting the power of Congress to abrogate sovereign immunity under Section 5 of the Fourteenth Amendment. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). *But see Nevada Department of Human Resources v. Hibbs*, —— U.S. ——, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

In *City of Boerne* and the subsequent decisions cited above, the Supreme Court has made clear that the authority vested in Congress under Section 5 of the Fourteenth Amendment is remedial or preventive in nature and is intended to provide for enforcement directly related to the provisions of the Fourteenth Amendment itself. *See City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157 ("The Fourteenth Amendment's history confirms the remedial, rather than substantive, nature of the Enforcement Clause [Section 5]"). Any legislation containing a provision for abrogation of sovereign immunity must be designed to remedy or prevent actions which would be unconstitutional under the Fourteenth Amendment. As the Supreme Court stated in *City of Boerne*:

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it

lies, that distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.

521 U.S. at 519–20, 117 S.Ct. 2157. The analysis employed in *City of Boerne, College Savings Bank, Kimel, Garrett* and *Hibbs* included a meticulous examination of the legislation involved in each case to determine whether it was designed to remedy or prevent patterns of conduct or actions in violation of Constitutional provisions. In the first four of these decisions, the Court found that the statutes in question contained substantive provisions granting private rights of action which exceeded the merely procedural or remedial limits of Constitutional enforcement. In *Hibbs,* the Court held the enforcement provisions of the statute to be within the remedial or preventive limits of Section 5.

The Bankruptcy Code does not pass the "congruence and proportionality" test employed in the *City of Boerne* line of decisions. Neither the Bankruptcy Code nor any of its provisions was enacted to enforce the Constitutional rights and privileges embodied in the Fourteenth Amendment or elsewhere in the Constitution. Certainly, none could suggest that Section 505 of the Code serves any Constitutional objective.

The debtors undoubtedly are correct in noting that " '[t]he evil Congress sought to remedy in Section 106 is governmental units defying bankruptcy law and then claiming sovereign immunity in the bankruptcy court' " (Omnibus Memorandum 18 (quoting *Wilson v. South Carolina State Educ. Assistance Auth. (In re Wilson),* 258 B.R. 303, 308–309 (Bankr.S.D.Ga.

2001))) and are partially correct in asserting that " 'there is clear evidence in the legislative history of the 1994 Bankruptcy Reform Act that Congress was utilizing its remedial power to stop governmental units from ignoring federal law, title 11 of the Bankruptcy Code, and thereby violating the privileges and immunities of federal citizenship guaranteed by the Fourteenth Amendment' " (Omnibus Memorandum 18 (quoting *2d Session Bankr.Reform: Hearings Before the Subcomm. on Econ. and Commercial Law of the Committee on the Judiciary House of Rep.,* 103d Cong. (1994) (statement of Cong. Mike Synar, Okla.) (cited in *In re Wilson,* 258 B.R. at 309))). It is true that Section 106 was intended to stop states from defying bankruptcy law and invoking the shield of immunity. It is not true that the Bankruptcy Code was enacted to vouchsafe the "privileges and immunities of federal citizenship guaranteed by the Fourteenth Amendment," and this is the relevant point under the governing Supreme Court precedent. The analysis required under *City of Boerne* and its progeny asks the question whether the statute itself, the Bankruptcy Code, meets the Supreme Court's test of "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Nothing in the Bankruptcy Code (and certainly not Section 505) was enacted to provide enforcement or remediation in respect of any of the "privileges and immunities of federal citizenship guaranteed by the Fourteenth Amendment." [18]

### D. *Ex parte Young*

 Alternatively, the debtors contend that even if the state defendants have im-

---

**18.** To the extent that the decisions in *In re Wilson,* 258 B.R. 303, *Arnold v. Sallie Mae Servicing Corp.,* 255 B.R. 845 (Bankr. W.D.Tenn.2000), and *Willis v. State of Okla-*

*homa Tax Commission (In re Willis),* 230 B.R. 619 (Bankr.E.D.Okla.1999), cited by the debtors, reach a different conclusion, this Court respectfully disagrees.

munity, this Court has jurisdiction over the state defendant officials under the doctrine first articulated in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which permits suit against a state official to enjoin a violation by the state of federal law even where the state itself could assert sovereign immunity. The *Ex parte Young* doctrine has long been recognized as a legal "fiction," applicable in a narrow range of circumstances to vindicate federal law in the face of state violation. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 114, n. 25, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

In the past, this Court has recognized the continuing necessity of the *Ex parte Young* doctrine to avoid "the potentially catastrophic effect of such a governmental creditor immune from the bankruptcy process," defying the Bankruptcy Code. *Metromedia Fiber Network Services, Inc. v. Washington Metro. Area Transit Auth. (In re Metromedia)*, 281 B.R. 524, 534, n. 6 (Bankr.S.D.N.Y.2002); *see also Berkelhammer v. Novella (In re Berkelhammer)*, 279 B.R. 660, 665, n. 3 (Bankr.S.D.N.Y. 2002) ("[T]he blanket invocation and application of sovereign immunity could have a devastating effect on the operation of the Bankruptcy Code and the bankruptcy process"). In its broadest understanding, the *Ex parte Young* doctrine "has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the 'supreme authority of the United States.'" *Pennhurst*, 465 U.S. at 105, 104 S.Ct. 900.

■■■ While the importance of the *Ex parte Young* doctrine to the federal judiciary's power to redress violations of federal law by state officials cannot be doubted, *see generally* Brubaker I, the doctrine is limited to cases where relief is sought against individual state officers in a federal forum "based on a *federal* right."

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (emphasis supplied). In determining whether the application of the *Ex parte Young* doctrine to the instant case is appropriate, the "court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing *violation of federal law* and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (emphasis supplied).

The fatal defect in the debtors' position is that their tax claims asserted under the umbrella of Section 505 are based on state tax law, not federal law, as required under *Ex parte Young*. If the tax assessments are indeed unlawful, the violation is of state law.

Recognizing the defect, the debtors argue that if the defendants are permitted to collect taxes from the debtors "for massively erroneous [sic] amounts, such collection would amount to a 'taking' in violation of the Constitution, a violation of the automatic stay, 11 U.S.C. § 362, and a violation of the discharge injunction to be issued on the confirmation under 11 U.S.C. § 1141(d)(1)(A)." Omnibus Memorandum 21. None of these assertions is correct, and no other purported violation of federal law is alleged.

Taking the alleged Bankruptcy Code violations first, the precise conduct which is automatically stayed by the filing of a petition in bankruptcy is set forth in subsections (1)-(8) of Section 362(a) of the Bankruptcy Code. It is not at all clear that the assessment, determination and collection of property taxes on an ongoing, current basis would fall within any of the subsections of Section 362(a). But that question is moot because Section 362(b), which sets forth those cases in which the filing of a petition "does not operate as a stay," in-

cludes in subsection (9)(D) "the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment...." Equally devoid of merit is the assertion that the conduct of the state and local defendants in assessing, determining and collecting property taxes, even in "massively erroneous amounts," would violate the debtors' discharge injunction to be issued on confirmation under 11 U.S.C. § 1141(d). Aside from the fact that, as of this date, there has been no confirmation of a plan for these debtors and there is no discharge injunction under Section 1141(d), nothing in the Bankruptcy Code has been drawn to this Court's attention which would authorize a bankruptcy court to enjoin the assessment, determination and collection of local property taxes on an ongoing basis, whether correctly assessed and determined by the local taxing authorities or not. Debtors have cited no authority to support their novel contention.[19]

■ Also baseless are the debtors' bare assertion (in the Omnibus Memorandum, but not in the complaints) that the defendants' prospective collection of "massively erroneous" taxes "would amount to a 'taking' in violation of the Constitution," and the conclusory allegation (in the complaints, but not in the Omnibus Memorandum) that such taxes would deprive them of Constitutional due process and equal protection. Absent the allegation of any specific facts amounting to a denial of the debtors' rights to due process or equal protection by the defendants, such conclusory allegations are insufficient to sustain a complaint for violation of a Constitutional right. *See Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir.1990), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991) (holding dismissal of plaintiff's claim is appropriate where complaint contains only conclusory allegations of a violation of a Constitutional right); *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987) (same).

The debtors rely on *Pacific Gas & Electric Co. v. Lynch (In re Pacific Gas & Electric Co.)*, 263 B.R. 306 (Bankr. N.D.Cal.2001) to support their assertion that an *Ex parte Young* injunction should issue because excessive taxes qualify as a taking in violation of the Constitution.[20] However, this reliance is misplaced because at issue in *Pacific Gas & Electric* was an accounting decision by public utility commissioners which had the alleged effect of setting public utility retail rates below plaintiff debtor's wholesale costs. *Id.* at 312. A government-mandated retail scheme that forces a company to operate at a loss has no parallel to levying ordinary property taxes on a business which would be unprofitable if the taxes were not reduced.

**19.** The debtors cite to *Goldberg v. Ellett (In re Ellett)*, 243 B.R. 741, 744 (9th Cir. BAP 1999), *aff'd*, 254 F.3d 1135 (9th Cir.2001), *cert. denied*, 534 U.S. 1127, 122 S.Ct. 1064, 151 L.Ed.2d 968 (2002) for the uncontroversial proposition that a debtor's adversary proceeding against a state tax official seeking to enjoin the state from collecting prepetition taxes post discharge is a classic definition of an *Ex parte Young* action. However, these adversary proceedings do not involve delinquent prepetition tax debts and the debtors are not here seeking to enforce the discharge injunction they hope to receive upon confirmation.

**20.** Although the *Pacific Gas & Electric Co.* court held that the debtor had made a prima facie allegation of a violation of federal law permitting the invocation of the *Ex parte Young* doctrine, the court nonetheless dismissed the debtor's complaint on the grounds that the commissioners were acting pursuant to the Section 362(b)(4) government regulatory and police power exception to the automatic stay and that no other actual or threatened violation of federal law had been alleged. *Id.* at 323.

The Supreme Court has consistently held that a tax—even a tax so oppressive as to force a regulated entity out of business—cannot be held invalid merely because a court may find the rate of taxation excessive. *McCray v. United States*, 195 U.S. 27, 60–61, 24 S.Ct. 769, 49 L.Ed. 78 (1904); *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 548, 19 L.Ed. 482 (1869) (stating "if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution"); *Alaska Fish Salting & By Products Co. v. Smith*, 255 U.S. 44, 48, 41 S.Ct. 219, 65 L.Ed. 489 (1921) ("even if the tax should destroy a business it would not be made invalid or require compensation on that ground alone. Those who enter upon a business take that risk"); *Magnano Co. v. Hamilton*, 292 U.S. 40, 47, 54 S.Ct. 599, 78 L.Ed. 1109 (1934) (the single premise that the amount of a tax is so excessive as to bring about the destruction of a business has been "uniformly rejected as furnishing no juridical ground for striking down a taxing act"). *See also Demes v. United States*, 52 Fed.Cl. 365, 369 (2002) ("Although taxes 'take' income, the imposition of a tax is not 'the taking of private property for public use in the sense of the constitution' ") (*citing County of Mobile v. Kimball*, 102 U.S. 691, 703, 26 L.Ed. 238 (1880)). Here, where the debtors are being affected by the same taxing scheme that regulates similar businesses in the respective states, their precarious financial situation does not serve to transform the tax into a taking. As stated by the Federal Court of Appeals:

> The constitutionality of the assessment should not depend on the happenstance of the financial condition of the assessed ... at the time of the assessment. We are unaware of any principle of takings law under which an imposition of liability is deemed a *per se* taking as to any party that cannot pay it.

*Branch v. United States*, 69 F.3d 1571, 1577 (Fed.Cir.1995).

The debtors also rely on *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041 (9th Cir.2000), *cert. denied*, 532 U.S. 958, 121 S.Ct. 1485, 149 L.Ed.2d 373 (2001), where the Agua Caliente Indian Tribe sought a declaratory judgment that application of a California sales and use tax would violate federal law prohibiting state taxation of value generating activities on reservation land. However, *Agua Caliente* is inapposite here because, unlike the debtors, who allege only violations of state law, the Indian Tribe had alleged specific violations of federal law.

In short, the debtors have alleged no facts and cited no statute, Constitutional provision, or other authority to support a claim that the alleged excessive state and local taxation of the Taxable Property constitutes a violation of federal law. *Ex parte Young* is not applicable.

### E. *Waiver of sovereign immunity*

█ It has been long established that when a state files a proof of claim in a debtor's bankruptcy, "it waives any immunity which it otherwise might have had respecting the adjudication of the claim." *Gardner*, 329 U.S. at 574, 67 S.Ct. 467; *see also College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd.*, 527 U.S. 666, 681, n. 3, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (noting that *Gardner* "stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts"); *California Franchise Tax Bd. v. Jackson*, 184 F.3d 1046, 1049 (9th Cir.1999) (holding that pursuant to *Gardner*, sovereign immunity is waived where a state tax board filed a proof of claim in a debtor's bank-

ruptcy case). However, no state defendant has filed a proof of claim in the debtors' bankruptcy cases.

▮▮▮ Nevertheless, the debtors assert that tax liability claims filed by non-state defendants are sufficient to waive the state defendants' immunity with respect to a Section 505 adversary proceeding. The non-state defendants who have filed proofs of claim include counties and municipalities. The debtors contend that pursuant to Bankruptcy Code Section 106(b),[21] waiver of sovereign immunity by local governmental units that have filed a proof of claim may be imputed to the state defendants. However, the Supreme Court has repeatedly observed:

> there is "no place" for the doctrine of constructive waiver in our sovereign-immunity jurisprudence, and ... we would "find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction."

*College Savings Bank,* 527 U.S. at 678, 119 S.Ct. 2219 (*quoting Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). There is neither "express language" nor "overwhelming implications from the text" nor any other basis[22] to support the contention that filing a proof of claim by a local governmental unit can be imputed to the state as a waiver of the state's immunity. *See Bezner v. E. Jersey State Prison (In re Exact Temp, Inc.),* 231 B.R. 566, 570 (Bankr.D.N.J.1999) (holding that Section 106(b) should be read narrowly to apply only to those govern-

mental units that actually filed a proof of claim in debtor's bankruptcy case); *see also In re Sacred Heart Hospital of Norristown,* 204 B.R. 132, 142 (E.D.Pa.1997), *aff'd,* 133 F.3d 237 (3d Cir.1998).

Alternatively, debtors rely on *In re Polygraphex Systems, Inc.,* 275 B.R. 408, 422 (Bankr.M.D.Fla.2002), where a county property appraiser asserted sovereign immunity when named in the debtor's objection to a proof of claim filed by a county tax collector on the ground that *ad valorem* taxes had been excessively assessed. The *Polygraphex* court found that "to allow the Property Appraiser to hide behind the technicality that he did not file the Claim would result in potentially shielding the county from any judicial review ... of a claim it chose to file in this bankruptcy case." *Id.* at 423. Therefore, the *Polygraphex* court held that when the tax collector filed a proof of claim it served to waive any immunity the property appraiser may have had for purposes of the Court's resolution of the objection filed by the debtor. *Id.*

It is of note that the controversy in *Polygraphex* conveyed *in rem* jurisdiction on the court. In that case, the filing of a proof of claim for taxes owed by the debtor's estate subjected the county and county property appraiser to the court's *in rem* jurisdiction to the extent of adjudicating objections to such claims. As explained in point II B, above, this case is different because the Section 505 adversary proceedings are plenary, *in personam* lawsuits, not objections to claims over which

---

**21.** Section 106(b) states: "A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose."

**22.** Indeed, the debtors have not alerted this Court to any state law that would indicate that non-state defendants had been granted the authority to waive sovereign immunity on behalf of the state defendants.

this Court would have *in rem* jurisdiction. In the instant case, no state defendant has filed a proof of claim and the debtors have not objected to any proof of claim filed by non-state defendants.

The limited holding of the *Polygraphex* court (where sovereign immunity was found to be constructively waived between two county officials for purposes of the court's resolution of a debtor's objection to a claim) cannot be inflated to justify a roving authority of this Court to subject the various state defendants to a universal valuation and assessment scheme in a Section 505 adversary proceeding.

### F. *Eleventh Amendment immunity and non-state defendants*

██ The debtors correctly assert that the umbrella of the Eleventh Amendment does not shield the non-state defendants from the jurisdiction of this Court in a Section 505 proceeding. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("The bar of the Eleventh Amendment to suit in federal court extends to States ... but does not extend to counties and similar municipal corporations") (*citing Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890) ("The Eleventh Amendment limits the ju-

risdiction [of federal courts] only as to suits against a State")). It has not been suggested that counties and municipal corporations enjoy sovereign immunity because "[i]mmunity from suit altogether is the lofty prerogative of the state alone by virtue of its sovereignty." *City of Newark v. United States*, 254 F.2d 93, 96 (3d Cir. 1958). Therefore, this Court may exercise jurisdiction over the non-state defendants in these Section 505 adversary proceedings.

### III. *Abstention*

██ All of the moving defendants ask this Court to exercise its discretion under 28 U.S.C. § 1334(c)(1) and 11 U.S.C. § 505(a)(1) to abstain from hearing these adversary proceedings. Both Section 1334(c) [23] and Section 505(a)(1) [24] grant the authority to abstain from hearing a Section 505 proceeding.

This Court has recognized that "Supreme Court precedent suggests that the federal courts should be sparing in the exercise of discretionary abstention." *Texaco Inc., v. Sanders (In re Texaco Inc.)*, 182 B.R. 937, 946 (Bankr.S.D.N.Y. 1995) (citing *New Orleans Public Service, Inc., v. Council of the City of New Orleans*, 491 U.S. 350, 358, 109 S.Ct. 2506,

---

**23.** 28 U.S.C. § 1334(c)(1) states: "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case arising under title 11." The Second Circuit Court of Appeals has confirmed that under Section 1334(c)(1) whether to abstain in a bankruptcy proceeding is a matter left to the discretion of the court. *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 232 (2d Cir.2002) (citing *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 708 (2d Cir. 1995)).

**24.** As the courts in this circuit have recognized, the plain language of Section 505(a)(1) grants a bankruptcy court "purely discretionary" authority to redetermine a debtor's tax liability. *Cody, Inc. v. County of Orange (In re Cody, Inc.)*, 281 B.R. 182, 192 (S.D.N.Y.2002). *See also New Haven Projects Ltd. Liability Co. v. City of New Haven (In re New Haven Projects Ltd. Liability Co.)*, 225 F.3d 283, 288, *cert. denied*, 531 U.S. 1150, 121 S.Ct. 1093, 148 L.Ed.2d 966 (2001) ("[A]n overwhelming number of courts have observed that § 505(a)(1) vests the bankruptcy court with general discretionary authority to redetermine a debtor's tax liability").

105 L.Ed.2d 298 (1989) ("Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred"); *Chicot County v. Sherwood*, 148 U.S. 529, 534, 13 S.Ct. 695, 37 L.Ed. 546 (1893) ("[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in favor of another jurisdiction"); *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909) ("When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.... The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied")). Indeed, "federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Coops., Inc.*, 48 F.3d 294, 297 (8th Cir. 1995) (quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Therefore, "despite the discretionary nature of the decision whether to abstain" from hearing the Section 505 adversary proceeding in the instant case, the decision to abstain may not be arrived at " 'as a matter of whim or personal disinclination.'" *Federated Rural Elec. Ins. Corp.*, 48 F.3d at 297 (citation omitted).

■ Recognizing the general precept that a federal court should exercise the jurisdiction conferred upon it absent a compelling reason not to do so, I have concluded that under relevant precedent in the Second Circuit there is a compelling reason to abstain in these adversary proceedings.

The Second Circuit Court of Appeals has stated "that under the current version of Section 505, a bankruptcy court has the discretion to abstain from redetermining a debtor's tax liability where uniformity of assessment is of significant importance." *In re New Haven Projects Ltd. Liability Co.*, 225 F.3d at 288. The Court grounded this assertion in an excerpt from the legislative history of Section 505, which explains that the provision was

derived, with only stylistic changes, from section 2a(2A) of the Bankruptcy Act [section 11(a)(2A) of former Title 11].... As under the Bankruptcy Act [former] section 2a(2A), *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941), remains good law to *permit* abstention where uniformity of assessment is of significant importance.

*Id.* (emphasis in original) (quoting 11 U.S.C.A. § 505, Historical and Statutory Notes at 723 (1993)). Given the Court of Appeals' reliance on the legislative history of Section 505, an examination into its underpinnings is warranted.

In *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941) the Supreme Court addressed "the right and power of a federal bankruptcy court to revise and redetermine for state tax purposes the property value of a [debtor] railroad ... in reorganization under ... the Bankruptcy Act," where the state had "already determined such value through its own taxing officials and in accordance with the procedure proscribed by valid state legislation." *Id.* at 137, 61 S.Ct. 888. The trustee for the debtor, having failed to appeal the state commission's tax assessment on the debtor's railroad property, petitioned the bankruptcy court to redetermine the amount of the tax by revising the value of property as assessed by the commission. *Id.* at 141, 61 S.Ct. 888. In an argument strikingly similar to that of the debtors in the instant case, the

trustee argued that the state commission had overvalued the debtor's property "by giving 'predominant weight to ... original cost and to cost of reproduction, and wholly inadequate consideration to the market value' ... 'and to an enormous reduction in earnings occasioned by general business considerations.'" *Id.* Nonetheless, the Supreme Court held:

[T]here is nothing in the history of bankruptcy or reorganization legislation to support the theory that Congress intended to set the federal courts up as super-assessment tribunals over state taxing agencies.... And the policy of revising and redetermining state tax valuations ... would be a complete reversal of our historic national policy of federal non-interference with the taxing power of states.

*Id.* at 145, 61 S.Ct. 888.

Section 505 clearly grants to the federal courts the power to revisit state and local tax determinations that *Arkansas Corp. Comm'n* declared to be lacking. But as recognized by the Second Circuit in *In re New Haven Projects Ltd. Liability Co.* and the legislative history to Section 505, abstention is appropriate "where uniformity of assessment is of significant importance" to the defendants' respective taxing schemes. *In re New Haven Projects Ltd. Liability Co.,* 225 F.3d at 288; *see also* 11 U.S.C.A. § 505, Historical and Statutory Notes at 723 (1993).

Local property taxation is inherently and quintessentially local in the sense that a fair allocation of the cost of government amongst the universe of local taxpayers is and must be a product of local political, legislative, executive and administrative decision making. The fundamental objective of taxation at the state and local level must be to apportion the tax burden equitably in accordance with the local political decision-making process. Where some

form or definition of market value is the touchstone for assessment, fair allocation among the tax base may depend more on the application to all affected taxpayers of uniform standards for assessing value than on an economist's ideal calculation of fair market value. An ideal calculation of fair market value (assuming such were possible) of taxable property comprising a multi-state communications system by a panel of experts (or a federal judge) may result in a valuation for assessment purposes which is highly discriminatory in favor of (or, conceivably, against) the multi-state taxpayer simply because the methodology used is different from the methodology to which all other similarly situated taxpayers are subjected in the various tax jurisdictions. Stated differently, in fairly apportioning the cost of government through property taxation, depending on the system adopted by the taxing state or local jurisdiction, it may not matter whether property is assessed at 80%, or 100%, or 120% of the current fair market value, so long as the same methodology is used to assess all similar property within the taxing jurisdiction.

In the context of this case, the debtors ask this Court to determine the actual fair market value of the debtor's Taxable Property using a common methodology for all twelve taxing jurisdictions. As stated in the debtors' Omnibus Memorandum (2–3):

The Defendants' claims comprise approximately 80 to 90% of all of the property tax claims the Debtors anticipate will be filed by all taxing jurisdictions. Accordingly, the Debtors submit that the process of valuing their tax claims would be vastly more efficient and economical if the Taxable Property located in the Defendants' sixteen jurisdictions is valued in the Bankruptcy Court in one simple streamlined proceeding. Indeed, that proceeding could be held in a mat-

ter of several days and would determine the valuation of the vast majority of the Debtors' Taxable Property. All of the Defendants would be afforded the opportunity to participate in cross-examination and call their own witnesses and experts. . . .

In valuing the assets located in the Defendants' jurisdictions, the Debtors expect to use common methodologies. The suggested method of valuation is simple and straight forward—fair market value, or what a willing a buyer would spend and a willing seller would accept. The Debtors will present evidence from an expert to establish fair market value. Recent sales of telecommunications assets have clearly demonstrated that the value of those assets have [sic] fallen drastically from their original cost to build, which is often the methodology employed by the states for tax purposes.

The problem with the debtor's "streamlined," unified approach to determining the "fair market value" of all of their Taxable Property in multiple taxing jurisdictions using a single methodology or combination of methodologies is that the resulting uniform valuation may produce results which are highly anomalous and discriminatory vis-à-vis other similarly situated taxpayers in the various taxing jurisdictions. Moreover, all of the defendants employ their own individualized schemes and methodologies for allocating the burden of taxation amongst all of the taxpayers in their respective jurisdictions. Even if, as the debtors assert, all of the defendant tax jurisdictions purport to utilize a concept of market value in the assessment process, the methodologies used are bound to differ. Any uniform valuation of the debtors' Taxable Property determined by this Court is bound to be at variance with state or local methodologies mandated by local law or practice, and with assessment valuation by the defendants of other taxpayer properties within their respective jurisdictions, producing disparate and discriminatory results.

Uniformity in the laws governing bankruptcies is constitutionally mandated in Article I, Section 8, Clause 4; but uniformity in taxation is not. Nothing in the Constitution or the Bankruptcy Code entitles a debtor to uniform property tax determinations in differing tax jurisdictions, and nothing in federal law entitles the federal courts to impose uniform taxation schemes or methodologies on state and local governments.

That is not to say that there is no occasion when a bankruptcy court should exercise the power conferred under Section 505 of the Bankruptcy Code. A proceeding under Section 505 may be appropriate in many circumstances where a taxing authority has acted in a manner which is arbitrary and capricious, discriminatory, or violative of state or local statutes or rules, or where the taxpayer/debtor has no practical redress for wrongdoing at the local or state level.

However, no such allegations are made in these adversary proceedings. The debtors simply assert that their local property taxes are too high because the defendants have assessed the debtors' Taxable Property using methodologies which do not take into account the recent drastic decline in profitability and capital value in the communications business. Barring some form of misconduct on the part of the defendant assessing and taxing authorities, which is not alleged here, the economic consequences of overcapacity and market devaluation in the communications industry must be addressed at the local level.

### Conclusion

The state defendants' motions to dismiss based on the Eleventh Amendment and sovereign immunity must be granted. The surrender of immunity in the plan of

the convention resulting from the uniformity requirement in Article I, Section 8, Clause 4 relating to bankruptcy laws is limited to proceedings to enforce the bankruptcy laws. The instant Section 505 proceedings are based upon and seek to enforce the debtors' rights under state and local property tax laws. The Section 505 proceedings depend on *in personam* jurisdiction against the state defendants and do not implicate the bankruptcy court's *in rem* jurisdiction. No violation of federal law is alleged, as required to invoke the *Ex parte Young* doctrine, and neither the Bankruptcy Code in general nor Section 505 in particular was enacted to prevent or remediate perceived infringements of the Fourteenth Amendment.

Except as to the state defendants, this Court has subject matter jurisdiction over these adversary proceedings and personal jurisdiction over the non-state defendants.

The non-state defendants' motions to abstain under 28 U.S.C. § 1334(c)(1) will be granted. Ad Valorem property taxation is governed by local law, and there is compelling local interest in "uniformity of assessment" in fairly allocating the local tax burden. Imposition by this Court of a standardized valuation methodology would entail a high risk of conflict with many if not all of the differing local tax laws as applied by the numerous local tax authorities here involved. Lacking any allegation of unlawful discrimination or other official misconduct in violation of local law, this Court will not exercise the power granted under Section 505.

I shall ask counsel for the debtors to prepare and circulate to defendants' counsel appropriate orders consistent with this decision, and submit the approved orders to the Court for signature.